UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| FLOYD LEWIS CHEESMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:21-cv-00045-JMS-MJD |
| | ) | |
| SWITZER Officer, | ) | |
| SUTER Officer, | ) | |
| VIGO COUNTY SHERIFF'S DEPARTMENT, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Floyd Cheesman was a pretrial detainee in the Vigo County Jail when, on December 4, 2020, two officers asked for his assistance with inmate Frederick Whitlock after Mr. Whitlock collapsed. Mr. Cheesman asked for gloves but was denied. Mr. Whitlock urinated and coughed up bloody mucus on Mr. Cheesman while Mr. Cheesman assisted him. Mr. Whitlock was then transported to the hospital where he died. Mr. Cheesman's request for a shower and change of clothes after the incident was denied. Mr. Whitlock tested positive for COVID-19, which led to the discovery that over 100 inmates at the jail were positive for the virus.

Based on these allegations, Mr. Cheesman has sued the Vigo County Sheriff's Department and two of its officers for violating his Fourteenth Amendment rights. The defendants have filed a motion for summary judgment. Dkt. 72. For the reasons below, that motion is **granted** as to the Vigo County Sheriff's Department and **denied** as to Officer Switzer and Officer Suter.

1

**I.**
**The Plaintiff's Brief**

Before the Court reaches the merits of the motion, it must express its dismay at the quality of the response in opposition to the defendants' motion for summary judgment submitted by Mr. Cheesman's counsel, William Morris. *See* dkt. 82. Attorneys practicing before this Court are expected to follow the Federal Rules of Civil Procedure and this Court's local rules when submitting briefs and evidence in support thereof. Mr. Morris did not submit the exhibits in support of his response until he was prompted to do so by the Court. Local Rule 56-1(b); dkt. 88. He did not support each fact that he asserted in his brief with a citation to the relevant exhibit. Local Rule 56-1(e).

The Court has no duty to search the record if a piece of evidence is not specifically cited in the manner described in subdivision (e) of Local Rule 56-1. Local Rule 56-1(h). Here, the record was small, and the Court chose to review the submitted video and the depositions of Mr. Cheesman and Nathan Epple. Had the Court not undertaken this review, the Court would not have identified the material factual disputes that preclude summary judgment. However, because the Court reviewed the entire record, it also recognized two significant misstatements of fact made by Mr. Morris. First, Mr. Cheesman testified that he asked one of the correctional officers for a pair of gloves, but he did not testify that he requested a mask, as Mr. Morris represented. *Compare* dkt. 72-1 at 14−15 (Cheesman deposition) ("I asked him for some – if me and Nate could have gloves. And he told us 'No,' that guards wasn't allowed to give inmates gloves.") *with* dkt. 82 at 3 ("Cheesman asks for a mask and gloves. The defendants have masks and gloves, but they deny Cheesman these most basic forms of Covid protection. Why? Cheesman is told that inmates are not allowed to have masks."). Second, despite Mr. Morris' assertion to the contrary, there is no evidence in the record that Mr. Whitlock, the inmate who passed away, defecated in

the midst of his medical emergency. Mr. Cheesman and Mr. Epple both testified that Mr. Whitlock urinated on himself and vomited. Dkt. 72-1 at 16−17, 19; dkt. 89-1 at 50, 87, 106. It's true that Mr. Epple used the expression "released his bowels" to describe Mr. Whitlock's actions. But reading his statements in context, it is clear that he misused that expression and was referring only to Mr. Whitlock's loss of bladder control and vomiting:

> "A: He released his bowels. He peed, urinated, and started vomiting."

Dkt. 89-1 at 50.

> "A: I thought Mr. Whitlock was dying as soon as he released his bowels.
> Q: And you said that's when he urinated on himself?
> A: Yeah . . . So it wasn't like he just peed a little bit. He – like, he released his entire bowels."

*Id.* at 87.

> "Q: So during the time that you and Floyd are trying to help move him, he urinated?
> A: Yeah.
> Q: And did he defecate?
> A: I'm not sure if he did or not."

*Id.* at 106.

In addition to these egregious misstatements, counsel's response brief is replete with typographical errors and fragmented sentences. Here is a sampling:

- "It was not until Whitlock's family paid for a private autopsy that the" Dkt. 82 at 2.

- "Perhaps under normal conditions (without Covid), Defendants' contention that Cheesman would "only be forced to wear" soiled clothes for one day." *Id.* at 6.

- "In *Smith v. Zachary*, 255 F.3d 446, 448−49 (7th Cir. 2001)." *Id.* at 7.

- "*Abbott v. Sangamon County*, 705 F.3d 9=723-24 (7th Cir. 201)." *Id.*

- "The viddo shows Switzer . . . " *Id.* at 8.

There is simply no excuse for submitting a brief with these errors. Counsel for the plaintiff requested and received extensions to prepare his response. Dkts. 78, 80.

Finally, counsel's legal analysis is conclusory, with inadequate or at times misplaced reliance on precedent. For example, in the section where counsel is supposed to present argument that the Vigo County Sheriff's Department's COVID-19 policies were the driving force behind a constitutional violation, counsel does not cite any relevant caselaw, such as *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978) and its progeny. Instead, he recites the statute defining what constitutes a civil action related to prison conditions, 18 U.S.C. § 3626(g)(2), and states, "This broad-brush definition incorporates the manner in which Cheesman was treated on the day on which Whitlock died[.]" Dkt. 82 at 7.

The Court does not dedicate three pages of this Order to this matter to humiliate Mr. Morris. But his lack of care evinces disrespect to the Court, opposing counsel, his client, and the legal profession. Mr. Morris must proofread filings before submitting them. He must ensure that his factual statements are supported by evidence (and include citation to that evidence) and that his arguments are supported by law. In the coming year, the Court encourages Mr. Morris to seek out CLE courses related to legal writing and to read books about quality written advocacy.[1] If counsel continues to submit shoddy written work in this Court, the Court may consider issuing sanctions. *See, e.g.*, *Servantes v. Commissioner of Social Sec.*, 2015 WL 870255, *9 (E.D. Mich. Feb. 27, 2015) (ordering monetary sanctions and considering referral for disciplinary proceedings where "counsel regularly presents briefs with woefully underdeveloped arguments.").

The Court now proceeds to the merits of the motion.

---

[1] *See e.g.,* BRYAN A. GARNER, LEGAL WRITING IN PLAIN ENGLISH: A TEXT WITH EXERCISES (2d ed. 2013); ROSS GUBERMAN, POINT MADE: HOW TO WRITE LIKE THE NATION'S TOP ADVOCATES (2d ed. 2014); and WILLIAM STRUNK, JR. & E.B. WHITE, THE ELEMENTS OF STYLE (4th ed. 2019).

## II.
## Standard of Review

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572−73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

**III.**
**Factual Background**

Because the defendants have moved for summary judgment under Rule 56(a), the Court

views and recites the evidence "in the light most favorable to the non-moving party and draw[s]

all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir.

2009) (citation omitted).

### A.  COVID-19 Policies at the Vigo County Jail

Beginning in March 2020, inmates who were booked into the jail were quarantined for

two weeks. Dkt. 72-4 at ¶ 9. Masks were provided to inmates for attending court hearings

beginning in June 2020. *Id.* at ¶ 10. Jail staff began wearing masks in August 2020. *Id.* at ¶ 11.

According to jail commander Charles Funk, incoming inmates began to receive masks in

November 2020, and masks were provided to "inmates in quarantine, leaving general population,

moving around the Jail and in common areas in November 2020." *Id.* at ¶¶ 12−13. Although this

statement would indicate that inmates were permitted to wear masks at all times by November,

inmate Nathan Epple testified that before December 2020, inmates within the jail were not

allowed to wear masks, and "[i]f [an inmate] got caught with one, they'd confiscate it." Dkt. 89-1

at 84. After a COVID-19 outbreak was identified in the jail in December 2020—due to the

incident that gave rise to this action—inmates were required to wear masks. Dkt. 72-4 at ¶ 18.

Inmates are provided with cleaning supplies each day. Dkt. 72-5 at ¶ 7. The cleaning

supplies include a mop, mop bucket, dust mop, toilet brush, spray bottle, and rags. *Id.* at ¶ 8.

Cleaning solution is included in the mop bucket and spray bottle. *Id.* at ¶ 9. Additional cleaning

and disinfecting measures—including a "fogging machine"—were implemented after the

December 2020 COVID-19 outbreak. *Id.* at ¶¶ 12−15.

### B.  December 4, 2020, Incident

Mr. Cheesman was booked into the Vigo County Jail as a pretrial detainee in September 2020. Dkt. 72-1 at 11. On December 4, 2020, he was housed in the B Block of the jail, along with fellow inmate Mr. Whitlock. *Id.* at 11−12.

Mr. Cheesman testified that Mr. Whitlock was known for being fit and working out in the jail daily. *Id.* at 25. About a week before the incident, Mr. Whitlock began sleeping in his cell all the time and only came out to pick up meal trays. *Id.* at 26. Each time he did, he advised correctional officers that he did not feel well and needed to see medical. *Id.* Mr. Cheesman heard Mr. Whitlock report four or five times that he had no energy, had lost his sense of taste, and believed he had COVID-19. *Id.* at 26−28. The guards told Mr. Whitlock to talk to the nurse during medication call. *Id.* at 28.

Breakfast was served to the inmates around 7 a.m. on December 4, a Friday. *Id.* at 13. Video of the cellblock shows guards and other staff wearing masks and gloves, while none of the inmates wore masks. (Video, Cellblock B, at 1:00). Mr. Whitlock had not emerged from his cell for breakfast, so someone went and woke him up. Dkt. 72-1 at 13. Mr. Cheesman observed Mr. Whitlock walking slowly with his head down to get his meal tray. *Id.* Shortly after Mr. Whitlock returned to his cell, inmates started yelling that there was a medical emergency. *Id.*; (Video, Cellblock B, at 1:27−1:41).

A guard looked into Mr. Whitlock's cell and ordered the other inmates to lock down. *Id.* Mr. Epple, one of Mr. Whitlock's cellmates, went to Mr. Cheesman's cell to provide the officers more space.[2] *Id.* at 13−14. Officer Suter and Officer Switzer alerted medical staff to the

---

[2] Mr. Epple is referred to as "Mr. Ethel" throughout Mr. Cheesman's deposition. The Court takes judicial notice that his name is Nathan Epple based on the fact that he has brought a civil rights action about this incident as well. *See Epple v. Plasse, et al.*, 2:20-cv-00692-JMS-MJD.

situation. *Id.* at 14. A nurse came to the cell and determined that Mr. Whitlock needed to be transported to the hospital because his oxygen levels were low. Dkt. 72-2 at ¶ 15.

Officer Switzer walked past four cells to the cell where Mr. Cheesman and Mr. Epple were locked down. (Video, Cellblock B, at 14:00). He approached Mr. Cheesman's cell and said, "Nate, you're a big man, come on. We need you to move him. And, Cheesman, come on." Dkt. 72-1 at 14. When Mr. Cheesman asked why they wanted his help, Officer Switzer responded, "We don't want to touch him." *Id.* Officer Switzer and Officer Suter attested that they needed the inmates' help due to Mr. Whitlock's size and the fact that Mr. Whitlock was too weak at that point to move on his own. Dkts. 72-2 at ¶ 17; 72-3 at ¶¶ 12−13. Mr. Cheesman asked Officer Suter for a pair of gloves, and Officer Suter said no because inmates were not allowed to have gloves. Dkt. 72-1 at 14−15.

Mr. Cheesman and Mr. Epple walked down to Mr. Whitlock's cell. (Video, Cellblock B, at 14:20). They lifted an unconscious Mr. Whitlock onto the wheelchair and wheeled him out into the corridor. Dkt. 72-1 at 16. As they were lifting him onto the chair, Mr. Whitlock urinated, his eyes rolled into the back of his head, and he started making a gurgling sound. *Id.* at 16−17. Mr. Cheesman told the officers that they should take Mr. Whitlock out of the wheelchair, so they removed him and placed him on the floor. *Id.* at 17. Mr. Cheesman recommended that they roll Mr. Whitlock onto his side so that he would not choke on his saliva. *Id.* They did, and Mr. Cheesman removed his shirt and put it under Mr. Whitlock's head until another officer came and put a blanket under him. *Id.* at 18−19; (Video, Cellblock B, at 15:50-16:30). Mr. Cheesman was on the floor by Mr. Whitlock when Mr. Whitlock spat blood and saliva up. Dkt. 72-1 at 19. Officer Suter applied a sternal rub, but Mr. Whitlock did not respond. Dkt. 72-3 at ¶ 20. Emergency medical technicians arrived, and Mr. Cheesman and Mr. Epple were sent back to

their cell. Dkt. 72-1 at 20−21. Mr. Whitlock was transported by ambulance to the hospital where he died. Dkt. 72-2 at ¶ 27; dkt. 72-4 at ¶ 14. Mr. Whitlock tested positive for COVID-19 at the hospital. Dkt. 72-4 at ¶ 14.

Back in the jail, Officer Suter provided Mr. Cheesman and Mr. Epple some cleaning supplies and ordered them to clean Mr. Whitlock's cell and the range outside his cell. Dkt. 72-1 at 40−41. After finishing, Mr. Cheesman asked Officer Suter and Office Switzer if he could shower and receive a change of clothes because he had Mr. Whitlock's bodily fluids on him. *Id.* at 41, 43. They said no because the jail was on lockdown due to the incident. *Id.* at 43. In general, inmate uniforms are exchanged once a week on Saturday. Dkt. 72-5 at ¶ 6.

The Indiana Department of Health Strike Force tested all inmates at the jail for COVID-19 after Mr. Whitlock's passing. Dkt. 72-4 at ¶ 16. Over 100 inmates tested positive during that testing. *Id.* at ¶ 17. Mr. Cheesman did not test positive then, or at any other point while he was at the jail. Dkt. 72-1 at 44. The Department of Health instructed jail staff to separate and isolate the positive inmates from the rest of the population. Dkt. 72-4 at ¶ 19. Inmates who tested positive were placed in separate cellblocks and quarantined for two weeks. *Id.* at ¶ 20. The jail was locked down on the Department of Health's recommendation; recreation was suspended, and inmates were allowed out of their cells for one hour to shower and speak with their families by phone. *Id.* at ¶¶ 21−23. Inmates were required to wear masks after the December 2020 COVID-19 outbreak. *Id.* at ¶ 18.

Mr. Cheesman testified that he is suing the defendants because he believes they compelled him and Mr. Epple to assist Mr. Whitlock without gloves, made them clean the area after Mr. Whitlock's transport to the hospital, and refused to provide him with a shower or clean

set of clothes. Dkt. 72-1 at 47−48. Mr. Cheesman suffered from emotional distress from the incident. *Id.* at 50−51.

## IV.
### Discussion

Because Mr. Cheesman was at all relevant times a pretrial detainee, his conditions-of-confinement claim is analyzed under the Fourteenth Amendment's Due Process Clause. *Hardeman v. Curran*, 933 F.3d 816, 821−22 (7th Cir. 2019). To prove a conditions-of-confinement claim, the Court applies an objective standard. *Id.* at 823. That is, Mr. Cheesman must show "that the conditions in [the jail] posed an objectively serious threat to his health; that the officers' response was objectively unreasonable under the circumstances; and that they acted purposely, knowingly, or recklessly with respect to the consequences of their actions." *Mays v. Emanuele*, 853 F. App'x 25, 27 (7th Cir. 2021) (citing *Hardeman*, 933 F.3d at 823, 827 and *Miranda v. County of Lake*, 900 F.3d 335, 353−54 (7th Cir. 2018)). The officers' response is objectively unreasonable if it is "not rationally related to a legitimate nonpunitive governmental purpose" or is "excessive in relation to that purpose." *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015) (cleaned up).

### A. Officer Suter and Officer Switzer

There is a material dispute of fact with respect to whether the individual officers knowingly, purposely, or recklessly exposed Mr. Cheesman to a serious threat to his health. There is no dispute that the COVID-19 virus created a serious risk of harm to detainees' health, and that the general risk of exposure is exacerbated by the close quarters that detainees are subjected to. *See Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (finding that "the objective prong is easily satisfied" as to inmates' claims under Eighth Amendment challenging conditions of confinement in federal prison with dormitory housing at the start of the pandemic).

10

The defendants argue that there is no evidence that Officer Suter or Officer Switzer knew that Mr. Whitlock was suffering from COVID-19 when he collapsed in his cell. But Mr. Cheesman testified that the officers told him that they requested his and Mr. Epple's assistance because they did not want to touch Mr. Whitlock. Dkt. 72-1 at 14. He also testified that Mr. Whitlock told correctional officers on several occasions in the days before he collapsed that he felt sick and suspected he had COVID-19. *Id.* at 26−27. Thus, a reasonable jury could infer that the officers suspected that Mr. Whitlock was sick with this highly contagious virus and that forcing Mr. Cheesman to help move him could create a serious risk of harm to his health.

To be clear, Mr. Cheesman does not argue that merely asking him to help move Mr. Whitlock was a constitutional violation. Dkt. 82 at 2. Rather, he argues that the conditions in which he was forced to help were unreasonable. *Id.* at 3−5. A reasonable jury could conclude that the officers acted recklessly when they refused to provide Mr. Cheeseman any personal protective equipment such as a mask or gloves while he assisted Mr. Whitlock and then subsequently refused to provide him access to a shower and a set of clean clothes. Neither officer explained why they would not provide Mr. Cheesman with these basic necessities after they had compelled him to assist with a sick inmate who urinated and vomited on himself and Mr. Cheeseman. Dkts. 72-2, 72-3. Although the jail's policy provided that inmates were only provided with clean clothes once a week, dkt. 72-5 at ¶ 6, a jury could conclude that it was unreasonable for the officers to blindly adhere to this policy under the circumstances. In other words, a jury could conclude that forcing an inmate to move an ill inmate during a pandemic without any protective gear and then making him sit in clothes soaked in that inmate's blood and urine for any length of time far exceeds the "legitimate nonpunitive governmental purpose" of requesting his assistance to move the sick inmate. *Kingsley*, 576 U.S. at 398. Accordingly,

because there are material disputes of fact related to whether Officer Suter and Officer Switzer's actions were objectively unreasonable, summary judgment cannot be granted.

The officers argue that even if their actions were unreasonable, they are entitled to judgment as a matter of law based on qualified immunity. "Qualified immunity is a doctrine that protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019) (cleaned up). Once a defendant raises qualified immunity as a defense, the burden shifts to the plaintiff to defeat it by showing "two elements: first, that the facts show a violation of a constitutional right, and second, that the constitutional right was clearly established at the time of the alleged violation." *Id.* (cleaned up). "'If *either* inquiry is answered in the negative, the defendant official' is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (quoting *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (emphasis in original)). The Court can consider the elements in either order. *Id.*

As to the first element, the Court has already concluded that there are disputes of material fact that prevent it from deciding whether Mr. Cheesman's rights were violated. *See Jerger v. Blaize*, 41 F.4th 910, 915 (7th Cir. 2022) (reversing grant of summary judgment where disputes of material fact precluded a finding of qualified immunity).

As to the second element, there are three ways Mr. Cheesman can demonstrate a right is "clearly established." *Stockton v. Milwaukee Co.*, 44 F.4th 605, 620 (7th Cir. 2022). First, he can point to "a closely analogous case finding the alleged violation unlawful." *Id.* (cleaned up). Second, he can identify "in the relevant caselaw such a clear trend . . . that [the court] can say with fair assurance that the recognition of the right by a controlling precedent was merely a

12

question of time." *Id.* (cleaned up). Third, he can argue that the officers' "conduct was 'so egregious and unreasonable that no reasonable official could have thought he was acting lawfully.'" *Id.* at 620−21 (cleaned up).

Mr. Cheesman falls somewhere between the first and third way. It is clearly established that inmates must be provided "with reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities." *Hardeman*, 933 F.3d at 820. And the Seventh Circuit has long recognized that exposing detainees to unhygienic conditions—including exposing them to human waste—combined with refusing to provide them with a way to clean themselves, states a claim for relief under the Fourteenth Amendment. *Budd v. Motley*, 711 F.3d 840, 843 (7th Cir. 2013). Additionally, although Mr. Cheesman did not contract COVID-19, his "exposure to psychological harm . . . is itself actionable." *Id.*

The only difference in Mr. Cheesman's case from other conditions-of-confinement cases is the length of the exposure to the conditions. In the course of helping Mr. Whitlock, Mr. Cheesman was exposed to Mr. Whitlock's urine, saliva, and blood. He was not permitted to shower or change clothes for a day. In most cases involving unhygienic jail conditions, the conditions lasted for at least several days. *See, e.g. Budd*, 711 F.3d at 843 (45 days in overcrowded and unhygienic conditions); *Hardeman*, 933 F.3d at 820−21 (three-day water shutdown); *Johnson v. Pelker*, 891 F.2d 136 (7th Cir. 1989) (three days in a cell with no running water and exposure to feces). This is where the third way comes in.

When this incident occurred, the COVID-19 pandemic had been raging for seven months. Most public places required masking. Millions of people worked from home to avoid exposure. By December 2020, nearly 270,000 Americans had succumbed to the virus.[3] A jury could

---

[3] Tommy Beer, *Forbes*, "November's Grim COVID-19 Totals: More Than 4.3 Million Infections and 37,000 Americans Killed," https://www.forbes.com/sites/tommybeer/2020/12/01/novembers-grim-covid-

conclude that failing to provide any protective gear, such as a mask or gloves, and then refusing to provide a shower and clean set of clothes after Mr. Cheesman helped move Mr. Whitlock was "egregious and unreasonable" conduct that no officer would find lawful. *Stockton*, 44 F.4th at 620−21; *see also Taylor v. Riojas*, 141 S. Ct. 52, 54 (2020) (finding that, in a case where an inmate was placed in a feces-covered cell for six days and slept in raw sewage, no reasonable officer could conclude that it was constitutionally permissible to house him in those conditions, and therefore, officers were not entitled to qualified immunity).

In short, the Court concludes that Officer Suter and Officer Switzer are not entitled to qualified immunity at this stage of the proceedings. Because there are material disputes of fact, summary judgment is **denied** as to Mr. Cheesman's claims against them.

### B. Vigo County Sheriff's Department

"Under *Monell v. Department of Social Services*, local governments . . . are liable for constitutional torts arising from their policies or customs." *Stockton*, 44 F.4th at 616 (citing *Monell*, 436 U.S. at 690). "*Monell* liability is rare and difficult to establish." *Id.* at 617.

For the Vigo County Sheriff's Department to be liable, Mr. Cheesman must show that a department policy or custom "was the 'moving force' behind [his] constitutional injury, a 'rigorous' causation standard demanding a 'direct causal link between the challenged municipal action and the violation of [his] constitutional rights." *Id.* (quoting *Dean v. Wexford Health Sources, Inc.,* 18 F.4th 214, 235 (7th Cir. 2021)).

Mr. Cheesman falls short of this exacting standard. He concedes that his constitutional violations were not due to the precautionary measures taken by the Vigo County Sheriff's Department. Dkt. 82 at 7. Counsel then repeats what happened to Mr. Cheesman and states,

---

19-totals-more-than-43-million-infections-and-37000-americans-killed/?sh=b1ec05e6acb2 (last updated Dec. 1, 2020).

"These circumstances are horrible, by anyone's standards." *Id.* He does not attempt to tie any of the jail's policies (such as their policy of not requiring inmates to wear masks in the jail before December 2020, or their policy of only providing clean clothes once a week) to what happened to Mr. Cheesman. His claim against the Vigo County Sheriff's Department is accordingly waived, and the department is entitled to summary judgment. *Mwangangi v. Nielsen*, 48 F. 4th 816, 829 (7th Cir. 2022) (noting that under the principle of party presentation, counsel is "responsible for advancing the facts and argument entitling them to relief" and undeveloped arguments are waived).

## V.
## Conclusion

For the foregoing reasons, the defendants' motion for summary judgment, dkt. [72], is **granted** as to the Vigo County Sheriff's Department and **denied** as to Officer Suter and Officer Switzer. Claims against the two individual officers will be resolved at a settlement conference or trial, scheduled for January 30, 2023.

The Court will issue a final pretrial conference order that will supersede all deadlines established in the case management plan at docket 33.

The magistrate judge is asked to meet with the parties to determine whether the case can be resolved without a trial.

**IT IS SO ORDERED.**

Date: 11/17/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

David P. Friedrich
WILKINSON GOELLER MODESITT WILKINSON AND DRUMMY
dpfriedrich@wilkinsonlaw.com

William Russell Morris, Jr.
LAW OFFICE OF WILLIAM R. MORRIS, JR.
wimorris.attorney@gmail.com